

# IN THE
# TENTH COURT OF APPEALS

### No. 10-15-00170-CR

**BEN McALPINE,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 77th District Court**
**Limestone County, Texas**
**Trial Court No. 13012-A**

## MEMORANDUM  OPINION

A jury convicted Appellant Ben McAlpine of aggravated assault of a family/household member with a deadly weapon and assessed his punishment at life imprisonment.  In his sole issue, McAlpine asserts that the trial court erred in denying his motion to suppress the statements he made after he invoked his right to remain silent. We will affirm.

McAlpine filed a motion to suppress statements he made to law enforcement on January 29, 2013. On that date, McAlpine met with law enforcement officials on three separate occasions. The first interview was with Detective Richard Hundley of the Mexia Police Department, during which McAlpine requested a polygraph examination. The second interview was with the polygraph examiner, during which McAlpine made incriminating statements relating to the injuries to the victim. The third interview was again with Hundley, during which McAlpine made further incriminating statements. McAlpine asserts that he was in custody during the first interview with Hundley and invoked his right to remain silent when, in response to Hundley questioning whether he wanted his attorney present, McAlpine stated, "I'll talk to you, but yeah, I'd like to have my attorney present, too." McAlpine argues that all questioning should have stopped at that point and that any statements he made after that time should have been suppressed.

After an evidentiary hearing, the trial court denied the motion to suppress and made the following findings of fact:

1.      On Friday, January 11th, 2013, [J.M.] was taken by air ambulance to Children's Hospital in Dallas, Texas. Child Protective Services and the Mexia Police Department were notified due to the nature of the injury to the infant;

2.      The mother of [J.M.] is [H.G.]. Ben McAlpine is not the biological father of the child. Mr. McAlpine resided in the home with [H.G.], [J.M.] and [H.G.]'s seven year old son;

3.      On January 11th, 2013, Detective Richard Hundley met with the mother of the injured child and Ben McAlpine (hereinafter referred to as "Mr. McAlpine or Defendant") at Children's Medical Center in

Dallas, Texas. . . . It was determined during that interview that the child caregivers were [H.G.] and Defendant. The detective also testified [H.G.] and the Defendant were the only two people who cared for the child;

4.      On January 16, 2013, Detective Hundley met with the Defendant at the Mexia Police Department. . . .

5.      On January 24, 2013, Detective Hundley met with the Defendant at his residence. Mr. McAlpine reenacted his actions on the date in question. . . .;

6.      The Defendant and his uncle, Travis McAlpine, met with Chad Morgan, an attorney in Fairfield, Texas on January 28, 2013. Mr. Travis McAlpine testified that the meeting was in connection with the investigation of the injuries of [J.M.] and certain family law issues. Mr. Morgan was not retained by either Mr. Travis McAlpine or Mr. Ben McAlpine following the meeting. In conjunction with such meeting, Mr. Travis McAlpine was provided with a business card of Mr. Chad Morgan. . . .;

7.      On January 29, 2013, Defendant and his uncle, Travis McAlpine[,] voluntarily went to the Mexia Police Department upon request. Mr. Ben McAlpine indicated he was 26 years old during that interview. . . .;

8.      Mr. Travis McAlpine testified that Defendant had a learning disability. . . .;

9.      After Travis McAlpine left the room, Detective Hundley asked the Defendant, "Do you want to talk to me or do you want your attorney present[?]" . . . ;

10.     The Defendant responded that he would talk to Detective Hundley but "Yeah, I want to have my attorney present too." . . . ;

11.     Thereafter, the Defendant immediately voluntarily continued to talk to Detective Hundley. The statements were not in response to any interrogation. . . . ;

12. Defendant concludes by stating he wishes to take a lie detector test;

13. At this point, Detective Hundley read the warnings required by [Code of Criminal Procedure] 38.22[,] and the Defendant waived his rights. Following his waiver, the Defendant met with a polygraph examiner. During this meeting, the Defendant volunteers information related to the alleged injuries to the child. . . .;

14. Following his interview with the polygraph examiner, the Defendant returned to Detective Hundley's office where he continues to make statements related to the alleged injuries to a child;

15. Following this interview, the Defendant is placed under arrest and in custody;

16. During the multiple interviews, the Defendant was not physically deprived of his freedom of action in any significant way. He was not placed in handcuffs, held in a locked cell or police car or physically restrained. . . . ;

17. The Defendant was told he had the right to terminate the interview at any time;

18. Law enforcement did not create a situation that would lead a reasonable person to believe that his freedom of movement was significantly restricted. The Defendant was free to leave and at points during the interview, did leave, returning voluntarily each time;

19. During the interview, Detective Hundley did not tell the Defendant he had probable cause to arrest. . . . ;

20. The Defendant was not in custody during the interrogation. The statements were not made as a result of custodial interrogation;

21. Adversary judicial criminal proceedings had not been initiated;

22. There was no violence, threats, isolation or deprivation of essentials during the interview. . . . ;

23. Mr. McAlpine's statements were voluntary and not a result of coercion;

24. Mr. McAlpine graduated from high school. . . . ;

25. At the time of the interview, he had been married previously. . . .;

26. At the time of the interview Mr. McAlpine held a job, had a current driver's license, and managed a household;

27. During the interview process, Defendant exhibited a rational comprehension of the questions and his responses;

28. Defendant was cooperative during the interview process.

The trial court also made the following conclusions of law:

1. Defendant's, Ben Bennie McAlpine, rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution were not violated;

2. Defendant's, Ben Bennie McAlpine, rights under Article 1, Section 9, 10 and 19th of the Constitution of the State of Texas were not violated.

After a defense objection, the trial court made the following additional conclusions of law:

1. The statements made by the Defendant were made freely and voluntarily without compulsion or persuasion.

2. Defendant's, Ben Bennie McAlpine's, rights under Articles 38.21, 38.22 and 38.23 of the Texas Code of Criminal Procedure were not violated.

A trial court's ruling on a motion to suppress is evaluated under a "bifurcated standard of review." *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016).

> First, we afford almost total deference to a trial judge's determination of historical facts. The judge is the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony. . . . Second, we review a judge's application of the law to the facts *de novo.* We will sustain the judge's ruling if the record reasonably supports that ruling and is correct on any theory of law applicable to the case.

*Id.* (footnoted citations omitted); s*ee also Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016) (footnoted citations omitted). When the trial court makes explicit fact findings, the reviewing court determines whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). The trial court's legal ruling is then reviewed *de novo* unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819. We also give due deference to the trial court's ruling on mixed questions of law and fact "if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Williams v. State*, 257 S.W.3d 426, 432 (Tex. App.—Austin 2008, pet. ref'd). The trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id*. The trial court "may choose to believe or disbelieve any or all of a witness's testimony." *Garza v. State*, 34 S.W.3d 591, 594 (Tex. App.—San Antonio 2000, pet. ref'd); *see also Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

McAlpine argues that the trial court erred in denying his motion to suppress because his confession was taken in violation of his federal constitutional rights. He asserts that the police continued to question him during a custodial interrogation after he

had invoked his right to remain silent. The State responds in part that McAlpine was not in custody during his questioning and, therefore, that no constitutional violation occurred.

The Fifth Amendment of the U.S. Constitution protects an individual from being compelled by the government to be a witness against himself. *Berkemer v. McCarty*, 468 U.S. 420, 428, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317 (1984); *Herrerra v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). "The warnings set out by the United States Supreme Court in *Miranda v. Arizona* were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation." *Herrerra*, 241 S.W.3d at 525 (citing *Miranda v. Arizona*, 384 U.S. 436, 442-57, 467-79, 86 S.Ct. 1602, 1611-19, 1624-30, 16 L.Ed.2d 694 (1966)). However, *Miranda's* safeguards apply only when an individual is in custody. *Estrada v. State*, 313 S.W.3d 274, 293-94 (Tex. Crim. App. 2010). If a suspect is not in custody, law enforcement officials have no duty to honor the invocation of his right to remain silent. *Id.* at 296.

"Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. It is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). Whether an individual is "in custody" depends upon a review of the

totality of the circumstances, and "the initial step is to ascertain whether in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id*. at 509 (citations omitted); *see also Estrada*, 313 S.W.3d at 294 ("[T]he ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) ("A person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest."). The second part of the inquiry focuses upon "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509, 132 S.Ct. at 1190.

The Court of Criminal Appeals has identified four general situations that may constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt*, 931 S.W.2d at 255. In the first three situations, "the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Id*. In the fourth situation, the information substantiating

probable cause must be "related by the officers to the suspect or by the suspect to the officers." *Id.*

In determining whether law enforcement has created a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, other circumstances that may be relevant include "whether the suspect arrived at the interrogation place voluntarily, the length of the interrogation, any requests by the suspect to see relatives or friends, and the degree of control exercised over the suspect." *Gardner v. State*, 433 S.W.3d 93, 98 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *see also Ervin v. State*, 333 S.W.3d 187, 205 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). Courts have also examined such things as the location of the questioning, statements made during the interview, the presence or absence of physical restraints, and the release of the interviewee at the end of questioning. *See Milam v. State*, No. AP-76379, 2012 WL 1868458, at *7 (Tex. Crim. App. May 23, 2012) (not designated for publication) (citing *Howes*, 565 U.S. at 509, 132 S.Ct. at 1189).

Questioning at a police station when a suspect arrives voluntarily does not necessarily indicate a suspect is "in custody," particularly when there is nothing to indicate that the suspect's freedom to depart was restricted in any way. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam). Nor is a police officer's plan to arrest a suspect relevant to whether a suspect was "in custody,"

unless the officer informs the suspect of his plan and tells him he is not free to leave. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151.

McAlpine argues that the situations outlined in *Dowthitt* are not exclusive and that the trial court should have considered the following: (1) McAlpine's mental acuity; (2) the removal of McAlpine's legal guardian from the interrogation room before questioning began; (3) the presence of multiple police; and (4) the creation of an atmosphere where McAlpine did not feel free to leave. McAlpine contends that, based on these considerations, the trial court should have concluded that he was in custody at the time he invoked his right to remain silent. Based on the totality of the circumstances, however, we believe that the trial court correctly concluded that McAlpine was not in custody during the interrogation.

Although the trial court found that McAlpine's uncle, Travis, testified that McAlpine had a learning disability, the trial court also found that McAlpine graduated from high school, had been previously married, held a job, had a current driver's license, managed a household, and "exhibited a rational comprehension of the questions and his responses." When viewed in the light most favorable to the trial court's ruling, these findings are supported by the evidence. *See Kelly*, 204 S.W.3d at 818. In the video of the interview, McAlpine does not appear to be mentally deficient or to lack understanding of his rights or Hundley's questions. Hundley testified that he did not notice anything in McAlpine's demeanor or in his answers to questions to indicate that McAlpine's mental

abilities were suspect. Hundley further testified that he was not informed that McAlpine had any type of mental deficiency. Hundley noted, "I knew he graduated from high school and he seemed to hold an intelligent conversation. Nobody had told me, you know, that he had any mental problems." H.G., the mother of the victim, testified that she had known McAlpine when they were in school together and that she had never known him to be in special education classes. She was also unaware that he had any learning problems. Travis testified that McAlpine graduated from high school in Kentucky, that McAlpine had been married, that McAlpine had been employed, and that McAlpine had a driver's license. H.G. and Travis both testified that McAlpine had been living independently with H.G. and her children and that he helped her with child care. The trial court, as the judge of the witnesses' credibility, was entitled to credit the testimony of Hundley and H.G. that McAlpine was not noticeably mentally deficient over the testimony of Travis. *See Williams*, 257 S.W.3d at 432.

There is also no evidentiary support for McAlpine's argument that he was deprived of his "caretaker." Travis testified that he was appointed conservator of McAlpine when McAlpine was eleven years old. Travis admitted, however, that he was never appointed McAlpine's legal guardian and that any custodial relationship over McAlpine ended once McAlpine reached the age of eighteen. Furthermore, while a suspect's ability to access friends and family may be relevant to determining whether a suspect is "in custody," there is nothing in the record to establish that McAlpine

requested the presence of his uncle or any other friends or family during his questioning. *See Zapata v. State*, No. 01-12-00666-CR, 2014 WL 2538553, at *5 (Tex. App.—Houston [1st Dist.] Jun. 5, 2014, pet. ref'd) (mem. op., not designated for publication). Therefore, Travis's exclusion from the interview, when all other circumstances are considered, did not create a custodial interrogation.

Next, although two officers may have been present during McAlpine's questioning, he was not interrogated by two officers. Detective Rodney Irvin was in the room where Hundley questioned McAlpine. However, Irvin did not question McAlpine nor make any statements during the interview until Hundley left the office to make arrangements for the polygraph examination. At that point, McAlpine asked Irvin if he could step out for a cigarette, and Irvin answered affirmatively after conferring with someone by telephone.

Finally, McAlpine argues that Hundley's actions created such a coercive environment that he did not feel free to leave. He argues that Hundley's statements were antagonistic and showed a belief in his guilt. After McAlpine stated that he wanted to continue talking with Hundley but that he wanted his lawyer present, Hundley told McAlpine that things did not look good for him. Hundley further stated that if McAlpine had a lawyer with him, the lawyer would not let McAlpine tell his side of the story. After Hundley made these statements, McAlpine renewed his request for a polygraph examination. Hundley then told McAlpine to go eat lunch while the polygraph examiner

traveled to the police station. McAlpine did go outside to smoke and voluntarily returned for the administration of the polygraph examination. The evidence therefore, supports the trial court's determination that Hundley's remarks did not create such a coercive environment that McAlpine did not believe he was free to leave.

Based on the totality of the circumstances, we conclude that the trial court correctly concluded that McAlpine was not in custody during the interrogation. We therefore hold that the trial court did not err in denying his motion to suppress. McAlpine's sole issue is overruled, and we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
          Justice Davis, and
          Justice Scoggins
Affirmed
Opinion delivered and filed October 25, 2017
Do not publish
[CRPM]

